



FILED
Mar 20 2026, 11:32 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Indiana Supreme Court

Supreme Court Case No. 26S-CR-86

## Marvin Moyers,
*Appellant*

—v—

## State of Indiana,
*Appellee*

Argued: June 18, 2025 | Decided: March 20, 2026

Appeal from the Ohio Circuit Court
No. 58C01-2206-F1-1
The Honorable F. Aaron Negangard, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 24A-CR-939

**Opinion by Chief Justice Rush**

Justice Goff concurs.
Justice Molter concurs with separate opinion.
Justice Slaughter dissents with separate opinion in which Justice Massa joins.

**Rush, Chief Justice.**

Six years ago, we overhauled Indiana's approach to substantive double jeopardy—the doctrine that provides state-law protections against multiple convictions for the same offense in a single trial. We announced two tests: the *Wadle* test, which applies when a defendant is convicted of different statutory offenses with common elements; and the *Powell* test, which applies when a defendant is convicted of a single statutory offense multiple times. Yet questions remain over the meaning of "single statutory offense" and the proper test when a defendant's convictions stem from multiple violations of the same statute with differing enhancing circumstances or penalty levels.

Here, a defendant was convicted of both Level 3 and Level 4 felony criminal confinement based on his use of a deadly weapon and his infliction of moderate bodily injury on the victim. Because the criminal confinement statute treats these offenses as elevated forms of a common base offense—Level 6 felony criminal confinement—we conclude that the statute defines a single statutory offense. We therefore apply the *Powell* test to determine whether the defendant was punished twice for the same offense. And we hold that he was, finding the record only supports one continuous confinement. We therefore reverse and remand with instructions for the trial court to vacate the lesser conviction and enter an amended sentencing order.

# Facts and Procedural History

Over a six-hour period in June 2022, Gregory Luhrsen endured a violent ordeal in his home. It began when he woke up one Sunday morning to hear a car running in his driveway. He went downstairs, through the basement, and into the garage to investigate. There he found Marvin Moyers—a stranger—holding his table saw. Moyers lunged at Luhrsen, knocked him down, and struck him repeatedly in the face with an old telephone receiver, rendering him unconscious. When Luhrsen regained consciousness, he was lying face down in the garage with his hands behind his back and Moyers kneeling on top of him. Moyers

eventually let Luhrsen stand up but only to push him through the garage, into the basement, up the stairs, and into the living room, where Moyers again hit him in the head with the phone. Moyers then went into a bedroom where he grabbed Luhrsen's cellphone and shotgun. Upon returning from the bedroom, Moyers used a telephone cable to tie up Luhrsen's hands and legs.

With Luhrsen tied up, Moyers began to rummage through the house, filling bags with items he wanted. During this time, Luhrsen managed to untie his hands but told Moyers he had done so to keep Moyers from thinking he "was going to start any kind of business." After finding a loaded handgun in a kitchen cabinet, Moyers carried it around with him. He eventually untied Luhrsen's legs so he could help carry bags full of his own possessions down to the garage. At one point, as Moyers seemed to be preoccupied on the other side of the garage, Luhrsen opened the basement door and made a run for the stairs, but he "didn't get too far." Moyers kicked in the door, and, because he was armed, Luhrsen stopped and retreated into the garage.

Following the failed escape attempt, Moyers pointed the handgun at Luhrsen's head then tied his hands behind his back with string. Moyers later cut the string so Luhrsen could help him carry more items from the house into the garage. After they were finished, Moyers used phone cables to tie Luhrsen's arms and legs to a chair in the dining room. But while Moyers continued to rummage through the house and take items down to the garage, Luhrsen untied his arms and legs and escaped through the front door into nearby woods. About thirty minutes later, Moyers drove off. Worried that he might return, Luhrsen waited another twenty-to-thirty minutes before walking back to his house.

As a result of the incident, the State charged Moyers with nine felony counts—including for burglary, criminal confinement, battery, and theft—and sought firearm and habitual offender enhancements. A jury found Moyers guilty of two counts each of burglary, criminal confinement, battery, and theft, and also determined he had used a firearm and was a habitual offender. The trial court then vacated five of those counts over double jeopardy concerns and entered convictions for Level 1 felony

burglary, Level 3 felony criminal confinement while armed with a deadly weapon, and Level 4 felony criminal confinement resulting in moderate bodily injury.

In a thoughtful, detailed sentencing order, the trial court sentenced Moyers to 100 years in the Department of Correction. As part of that decision, the court imposed a sixteen-year sentence for the Level 3 felony confinement and a twelve-year sentence for the Level 4 felony confinement. And the court ran those sentences consecutively because Moyers had confined Luhrsen "multiple times with different means," specifically with a handgun and with twine. But the court capped the aggregate of those two sentences at twenty years because they arose from a single episode of criminal conduct. *See* Ind. Code § 35-50-1-2(d). The court also imposed forty years for the burglary and added twenty years each for the firearm and habitual offender enhancements.

Moyers appealed, arguing that his two criminal confinement convictions improperly punished the same offense under *Powell v. State*, 151 N.E.3d 256 (Ind. 2020). The State conceded that the *Powell* test governed but maintained Moyers committed two "separate instances of confinement during the burglary"—one before Luhrsen's thwarted attempt to flee from the garage and another after.

A divided panel of our Court of Appeals affirmed in a published opinion. *Moyers v. State*, 249 N.E.3d 667, 673 (Ind. Ct. App. 2024). Despite the parties' agreement that the *Powell* test applied, the majority applied the *Wadle* test and found no double jeopardy violation. *Id.* at 671–73 (citing *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020)). But Judge Bailey dissented, believing *Powell* applied and concluding Moyers had committed a single continuous act of confinement that permitted only one conviction. *Id.* at 675–77 (Bailey, J., dissenting).[1]

Moyers petitioned for transfer, which we now grant, vacating the Court of Appeals' opinion. Ind. Appellate Rule 58(A).

---

[1] Labeled a dissent in part.

## Standard of Review

Resolving this appeal turns on statutory interpretation, which we conduct de novo. *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020).

## Discussion and Decision

In recent decades, criminal statutes have increasingly defined overlapping crimes, added enhancements that elevate an offense's penalty level, and divided criminal conduct into fragmentary, individually chargeable units. We previously recognized these trends in explaining how the prohibition against double jeopardy evolved "to embody a substantive bar to multiple convictions or punishments for the 'same offense' in a single trial." *Wadle v. State*, 151 N.E.3d 227, 238–39 (Ind. 2020). But as we continue to develop our substantive double jeopardy doctrine in the face of more overlapping offenses and enhancements, the precise definition of "same offense" remains a "divisive—and confounding—question." *Id.* at 238.

In the last six years, we've intended to provide guidance for answering this question. *Wadle* addressed scenarios when "a single criminal act or transaction violates multiple statutes with common elements." *Powell v. State*, 151 N.E.3d 256, 263 (Ind. 2020) (citing *Wadle*, 151 N.E.3d at 247). And we later clarified "perhaps misunderstood directions" for applying *Wadle*. *A.W. v. State*, 229 N.E.3d 1060, 1066 (Ind. 2024). Meanwhile, *Powell* addressed "multiplicity," which occurs "when a single criminal act or transaction violates a single statute and results in multiple injuries." 151 N.E.3d at 263. We premised our approach on the Legislature's "prerogative" to define "whether a **single statutory offense** will 'subsist for a definite period or cover successive, similar occurrences.'" *Id.* at 264 (quoting *Hines v. State*, 30 N.E.3d 1216, 1220 (Ind. 2015)) (emphasis added). And we set forth a test for determining "whether—and to what extent—the applicable statute permits the fragmentation of a defendant's criminal act into distinct 'units of prosecution.'" *Id.*

Since those decisions, uncertainty has persisted over the meaning of "single statutory offense" and, particularly, whether *Powell* or *Wadle* applies when a defendant's convictions stem from multiple violations of the same statute with differing enhancing circumstances or penalty levels. For example, panels of our Court of Appeals have diverged in deciding whether such convictions implicate distinct statutory offenses due to their different enhancing circumstances or penalty levels, or a single statutory offense because they share the elements of a common base offense—the simple form of the offense with the lowest penalty. *Compare Boner v. State*, 243 N.E.3d 354, 365 (Ind. Ct. App. 2024), *with Jones v. State*, 159 N.E.3d 55, 64–65 (Ind. Ct. App. 2020), *trans. denied*. As Judge Vaidik has explained, "[n]either the *Wadle* test nor the *Powell* test applies neatly" to situations involving multiple convictions "under a single statute for a single criminal act against a single victim where multiple enhancing circumstances under the statute are present." *Jones*, 159 N.E.3d at 67 (Vaidik, J., concurring).

To resolve this uncertainty, we look to how our Legislature—vested with the exclusive authority to define crimes—distinguishes between base offenses and their elevated counterparts. *See* I.C. § 1-1-2-2. And we ultimately conclude that a base offense and its elevated forms constitute a single statutory offense for purposes of determining whether to apply *Wadle* or *Powell*. Here, because Level 3 and Level 4 felony criminal confinement are elevated forms of a common base offense—Level 6 felony criminal confinement—they fall within the single statutory offense of criminal confinement. This conclusion does not, of course, necessarily mean that Moyers was punished twice for the same offense. Rather, it means that we apply *Powell* to determine how many discrete acts of criminal confinement he committed. And, finding the evidence establishes only a single continuous confinement, we hold that Moyers committed just one offense and thus reverse and remand.

# I. The *Powell* test applies to multiple convictions for elevated offenses that share a common base offense.

Before we can analyze whether Moyers's two elevated criminal confinement convictions punished the same offense, we must decide whether they implicate a single statutory offense and the *Powell* test or multiple statutory offenses and the *Wadle* test. Both parties agreed in their briefs that *Powell* governed the analysis. But at oral argument, the State changed its position and contended *Wadle* should apply instead.

The State's vacillating position mirrors a split between Court of Appeals panels over whether elevated offenses that share a common base offense constitute a single statutory offense or distinct statutory offenses. Most post-*Powell* cases have treated multiple elevated offenses as separate statutory offenses. For example, in *Boner*, the panel applied *Wadle* after determining that two convictions for dealing in methamphetamine—one elevated for involving over one gram and the other for over five grams—were distinct crimes defined under separate statutory subsections. *Boner*, 243 N.E.3d at 365; *see also Robinson v. State*, 251 N.E.3d 1124, 1130–31 (Ind. Ct. App. 2025) (analyzing resisting law enforcement convictions, elevated for use of a vehicle and bodily injury respectively, under *Wadle*), *vacated*.[2] But in *Jones*, the panel applied *Powell* in analyzing two kidnapping convictions—one elevated for bodily injury and the other for intent to obtain a ransom. 159 N.E.3d at 64. These decisions illustrate an ongoing divide over whether the proper test, *Powell* or *Wadle*, turns on the distinct enhancing circumstances of the elevated offenses or on their shared underlying base offense.

We conclude that the Legislature's intent—discerned from statutory text and structure—controls whether two or more elevated offenses are part of a single statutory offense. When a statute defines a common base

---

[2] We grant transfer today in *Robinson*, vacate the Court of Appeals' opinion, and remand the case to the Court of Appeals to reconsider in light of this opinion.

offense that can be elevated to higher penalty levels through attendant circumstances or results, the base offense and its elevated forms together constitute one statutory offense. But when a statute defines distinct base offenses, the elevated forms derived from those separate bases are distinct statutory offenses. Thus, in deciding whether *Powell* or *Wadle* applies, the fact that two offenses either appear in the same statutory section or differ only in their enhancing circumstances is not dispositive. The key question is whether the elevated offenses share a common underlying base offense.

To illustrate the different ways our Legislature has defined offenses, we highlight three categories of criminal statutes. Category One includes statutes that define a base offense and elevated offenses as a single statutory offense, rendering *Powell* the proper test. And, as we explain, the criminal confinement statute falls within this category. We then briefly turn to two other categories to guide the bench and bar in other cases. Category Two includes statutes that define separate base offenses and, therefore, distinct statutory offenses, meaning *Wadle* applies. And Category Three includes statutes that create a base offense using alternative elements. These statutes must be read carefully to discern whether the Legislature intended to define one statutory offense (meaning *Powell* applies) or multiple (meaning *Wadle* applies).

### A. Category One: elevated offenses that share a common base offense constitute a single statutory offense.

Criminal statutes in this category define a base offense that can be elevated to higher penalty levels based on attendant circumstances or results. The criminal confinement statute is one such example, as shown in the following excerpt:

> (a) A person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement. Except as provided in subsection (b), the offense of criminal confinement is a Level 6 felony.

(b) The offense of criminal confinement defined in subsection (a) is:

　　(1) a Level 5 felony if:

　　　　(A) the person confined is less than fourteen (14) years of age and is not the confining person's child;

　　　　(B) it is committed by using a vehicle; or

　　　　(C) it results in bodily injury to a person other than the confining person;

　　(2) a Level 4 felony if it results in moderate bodily injury to a person other than the confining person;

　　(3) a Level 3 felony if it:

　　　　(A) is committed while armed with a deadly weapon;

　　　　. . . .

I.C. § 35-42-3-3(a)–(b)(3)(A).

Subsection (a) defines the base offense of criminal confinement and sets its lowest penalty level at a Level 6 felony. Subsection (b)(1) then elevates this "offense of criminal confinement" to a Level 5 felony if any one of three circumstances is present. Subsections (b)(2) and (b)(3) operate similarly, providing ways in which the base offense can be elevated to a Level 3 or 4 felony. Thus, the unambiguous text and structure of this statute confirm that criminal confinement offenses with enhancing circumstances are elevated forms of the Level 6 base offense, not distinct statutory offenses. *Cf. Kelly v. State*, 527 N.E.2d 1148, 1155 (Ind. Ct. App. 1988) (explaining that bodily injury and death enhance the punishment for OWI but are not "aspect[s] of the crime itself"), *summarily aff'd*, 539 N.E.2d 25 (Ind. 1989).

Other criminal statutes use comparable text and structure in relating elevated offenses to a base offense. *See, e.g.*, I.C. § 35-42-2-2(a)–(b) (criminal recklessness); I.C. § 35-43-4-3 (criminal conversion). But some criminal statutes elevate a base offense by implicitly referring to definitions in other statutes. *See, e.g.*, I.C. § 35-48-4-6.1 (creating the base offense of methamphetamine possession and elevated offenses, some of which require an "enhancing circumstance"); I.C. § 35-48-1.1-18 (defining "enhancing circumstance[s]"). These alternative approaches reveal that the Legislature's "decision to delineate separate crimes in one statute as opposed to two" does not dictate whether *Powell* or *Wadle* applies. *Koziski v. State*, 172 N.E.3d 338, 342 (Ind. Ct. App. 2021), *trans. denied*. Rather, the key question is whether the Legislature has made two elevated offenses part of a single statutory scheme by linking them to the same base offense. Because the criminal confinement statute does just that, *Powell* is the proper test.

Yet the State disagreed during oral argument, observing that Moyers's Level 3 felony criminal confinement conviction did not include every element of his Level 4 conviction because using a deadly weapon and causing moderate bodily injury are different types of enhancing circumstances. In the State's view, then, the two offenses cannot merge into a single statutory offense. But the State's focus on the enhancing circumstances is misplaced because, for purposes of analyzing multiplicity, those circumstances are not elements of the offenses.[3] Indeed, we've explained that "[s]ome crimes are defined such that the consequence is not an element of the crime, but can enhance the penalty." *Mathews v. State*, 849 N.E.2d 578, 582 (Ind. 2006). And "if the consequence serves primarily to enhance the penalty for a crime that is committed without the consequence," then "multiple consequences do not establish multiple crimes." *Id.* The text of the criminal confinement statute reinforces this understanding. Under such statutes, "multiple egregious

---

[3] Under the Sixth Amendment, however, enhancing circumstances, other than the fact of a prior conviction, constitute material elements that must be proven to a jury. *See Robertson v. State*, 871 N.E.2d 280, 286 (Ind. 2007).

results do not increase the number of crimes, only the penalty." *Kelly*, 527 N.E.2d at 1155. And so, because an enhancement cannot stand alone without its base offense, the enhancement does not create a separate offense absent "express authorization" by the Legislature. *Paquette v. State*, 101 N.E.3d 234, 240–41 (Ind. 2018); *see also Jones*, 159 N.E.3d at 64.

In sum, because statutes within this first category, including the criminal confinement statute, establish elevated offenses that share a common base offense, such statutes each define a single statutory offense. For that reason, multiple convictions under these statutes are reviewable under *Powell*. We reiterate, however, that such convictions are not necessarily for the same offense, as they might not punish the same criminal conduct twice. We simply hold that the *Powell* test applies to determine whether a defendant's course of conduct constituted more than one discrete instance of a single statutory offense.

In contrast to this first category, we next highlight statutes that define multiple distinct base offenses.

## B. Category Two: separate base offenses constitute distinct statutory offenses.

The second category contains statutes that define multiple base offenses and, thus, distinct statutory offenses. For example, Section 35-43-2-3 defines three separately named base offenses concerning computers, each with its own distinct elements: computer trespass; computer merchandise hoarding; and unlawful distribution of a hoarding program. I.C. § 35-43-2-3(b)–(d). Another example is found in Section 35-44.1-2-3, which defines two base offenses that share the same name but have different elements. Subsection (c) sets forth elements for "false reporting, a Level 6 felony," while Subsection (d) sets forth entirely different elements for "false reporting, a Class B misdemeanor." I.C. § 35-44.1-2-3(c)–(d).

Because separate base offenses constitute distinct statutory offenses, multiple convictions for them are reviewable under *Wadle*. And the statutes, like those cited above, reinforce the point that the applicability of *Wadle* or *Powell* does not turn on whether the convictions arise from the

same statute or from different statutes. Rather, the proper test depends on whether the convictions are for offenses stemming from one base offense or two.

Before applying *Powell* to Moyers's criminal confinement convictions, we briefly highlight a third category of statutes that do not fit neatly into either of the first two categories.

### C. Category Three: base offenses with alternative elements may constitute one or multiple statutory offenses.

The third category contains statutes that may pose interpretive challenges because they create a base offense with alternative elements, such that distinct criminal acts can constitute the base offense. Some do so by using the disjunctive "or" construction. *See, e.g.,* I.C. § 35-42-4-1(a) (defining four circumstances in which "sexual intercourse" or "other sexual conduct" constitute rape); I.C. § 35-43-1-1(a) (setting forth four alternative elements of arson). Others simply list the various circumstances that constitute the base offense. *See, e.g.,* I.C. § 35-47-2-1.5(b) (defining ten categories of person whose carrying of a handgun constitutes an offense). These statutes, like those in Category One, may also create elevated forms of their disjunctive base offenses. *See, e.g.,* I.C. § 35-42-4-1(b) (providing circumstances that enhance rape to a Level 1 felony).

Since *Powell*, several Court of Appeals panels have interpreted statutes like these to discern whether the Legislature intended to define a single statutory offense or multiple. *See, e.g., Koziski*, 172 N.E.3d at 341–42 (finding distinct child molesting statutory offenses); *Morales v. State*, 165 N.E.3d 1002, 1009 (Ind. Ct. App. 2021) (finding one arson statutory offense), *trans. denied*; *Stone v. State*, 226 N.E.3d 829, 833 (Ind. Ct. App. 2024) (finding distinct rape statutory offenses), *trans. denied*. In *Stone*, for example, the panel applied *Wadle* after concluding that the defendant committed two "separate—indeed, mutually exclusive—criminal acts" under the same subsection of the rape statute: "forcible sexual intercourse and forcible other sexual conduct." 226 N.E.3d at 833. But because the criminal confinement statute at issue defines only one base offense, we

simply note the complexity and nuance some other cases require in interpreting statutory text and structure.

Having explained why the *Powell* test applies to multiple elevated criminal confinement convictions, we now apply that test to determine whether both of Moyers's challenged convictions may stand.

## II. Moyers's two criminal confinement convictions punish him twice for the same offense.

Recall that Moyers asserts his convictions for Level 3 felony criminal confinement while armed with a deadly weapon and Level 4 felony criminal confinement resulting in moderate bodily injury amount to multiple punishments for the same offense. The State disagrees, contending that Moyers committed two offenses in that he confined Luhrsen, lost control of him, and then confined him a second time. For the reasons explained above, we apply *Powell* to resolve this issue. And we hold that the evidence establishes Moyers's conduct constituted a single continuous confinement, permitting just one conviction.

### A. The criminal confinement statute permits one conviction per period of confinement.

We begin by describing the mechanics of the *Powell* test, which enables us to discern when the criminal confinement statute permits the "fragmentation" of a course of criminal conduct into two or more punishable offenses. *Powell*, 151 N.E.3d at 264. The test potentially requires two steps. But here we ultimately need just the first step to ascertain that the statute permits only one conviction for a single period of continuous confinement.

At step one of the test, we determine "[i]f the statute, whether expressly or by judicial construction, indicates a unit of prosecution." *Id.* A "unit of prosecution," in simple terms, is the specific act or conduct our Legislature intended to treat as one punishable offense under a criminal statute. *See United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015) (en

banc); *Jones*, 159 N.E.3d at 63. A statute may expressly define the unit of prosecution. *Powell*, 151 N.E.3d at 264 & n.6; *see, e.g.*, I.C. § 9-30-5-4(b) (providing that a separate offense of OWI causing serious bodily injury is committed for each person so injured). But if not, we identify the unit of prosecution by determining whether the statute is "conduct-based" or "result-based." *Powell*, 151 N.E.3d at 265. A conduct-based statute defines an offense "by certain actions or behavior," and "the crime is complete once the offender engages in the prohibited conduct, **regardless** of whether that conduct produces a specific result." *Id.* at 265–66. Under such statutes, "a single discrete incident can be the basis for only one conviction." *Id.* at 266 (quoting *Paquette*, 101 N.E.3d at 239). By contrast, a result-based statute defines an offense "by the defendant's actions **and** the results or consequences of those actions," thus permitting "multiple convictions when multiple consequences flow from a single criminal act." *Id.*

Once we identify a statute's unit of prosecution, we turn to the facts to determine how many discrete offenses the evidence supports. *See Jones*, 159 N.E.3d at 64–65. But if the statute's unit of prosecution remains ambiguous, we move on to the second step of the analysis. *Powell*, 151 N.E.3d at 264.

At step two, if necessary, we "determine whether the facts—as presented in the charging instrument and as adduced at trial—indicate a single offense or whether they indicate distinguishable offenses." *Id.* The question at this stage is "whether the defendant's actions are 'so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction.'" *Id.* (quoting *Walker v. State*, 932 N.E.2d 733, 735 (Ind. Ct. App. 2010)). As the Court of Appeals has recognized, this step effectively absorbs the common-law continuous crime doctrine. *Jones*, 159 N.E.3d at 62. And, in conducting this analysis, "[a]ny doubt counsels 'against turning a single transaction into multiple offenses.'" *Powell*, 151 N.E.3d at 265 (quoting *Duncan v. State*, 412 N.E.2d 770, 775 (Ind. 1980)). This last principle reflects the rule of lenity whereby courts "resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment." *Bell v. United States*, 349 U.S. 81, 83 (1955).

Here, we need just *Powell*'s first step to ascertain that the criminal confinement statute permits only one conviction for a single period of continuous confinement. The parties appropriately agreed in their briefing that the criminal confinement statute contains no express unit of prosecution but nevertheless sets forth a conduct-based crime. As the State pointed out, "[c]riminal confinement is a conduct-based statute since the gravamen of the offense is a person's act of confining another person without their consent." *Cf. Madden v. State*, 162 N.E.3d 549, 560–61 (Ind. Ct. App. 2021) (explaining that kidnapping is conduct-based because its gravamen is the act of "removing the victim"). To that point, we've recognized that a "confinement ends when the victim both feels free and is, in fact, free from detention, and a separate confinement begins if and when detention of the victim is re-established." *Penrod v. State*, 810 N.E.2d 345, 346 (Ind. 2004) (quoting *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002)). So if there is just one confinement, "multiple convictions are inappropriate even when there are variations in the way the counts are charged." *Id.* The ultimate question, therefore, is whether the evidence shows Moyers committed one or two discrete acts of criminal confinement.

## B. Because the evidence establishes Moyers imposed only one period of confinement, only one criminal confinement conviction may stand.

Moyers maintains that he "continuously confined" Luhrsen from when he restrained him on the garage floor until Luhrsen ran out of the house. The State counters that "Luhrsen's period of confinement was broken" midway through his ordeal "when he felt capable of and did run away from Moyers in the garage and into the basement" and that Moyers "re-established Luhrsen's confinement when he caught Luhrsen and tied him up a second and third time." We agree with Moyers and conclude that the evidence shows a single continuous confinement occurred.

Our analysis is guided by *Bartlett v. State,* 711 N.E.2d 497 (Ind. 1999). In that double-kidnapping case, we had to determine whether the defendant used one of the two victims, Michael, as a shield or hostage during the

period of his confinement. *Id.* at 500. And that issue required us to "define the temporal span" of the offense. *Id.* During the ordeal, the defendant had pointed a gun and brandished a knife at the victims and tied them up with duct tape. *Id.* at 498–99. At least once, the defendant made Michael enter a store to buy beer and cigarettes while the defendant was outside with the other victim. *Id.* at 499. Eventually, both victims managed to break out of the house where the defendant was holding them. *Id.* In affirming the defendant's conviction for kidnapping, we explained that the span of a "kidnapping or confinement is determined by the length of time of the unlawful detention necessary to perpetrate the crime." *Id.* at 500. And we concluded that the entire ordeal from the defendant's first pointing of the gun at Michael until his ultimate escape constituted one offense. *Id.* at 500–01. It did not matter that Michael had been confined using different means or that he had gone into the liquor store alone. *See id.* At all times, "Michael was either tied up, under the control of the gun, or acting under the threat or fear of force," so he was continuously confined. *Id.* at 501. And the defendant had used him as a hostage during that confinement. *Id.*

Likewise here, Luhrsen was never actually free and certainly never felt free from the moment he was first knocked down and restrained until he ran from the house almost six hours later. Moyers began by beating Luhrsen and kneeling on top of him. Moyers then let him stand up only so he could push him into the house before beating him again and tying him up. After that, Moyers kept Luhrsen tied up except when compelling him to carry his possessions down to the garage. And even when Luhrsen untied the cable around his hands while upstairs, he let Moyers know he had done so to avoid "trouble." To be sure, Luhrsen tried at one point to escape from the garage, passing through the basement door and making "a run for the stairs." But he "didn't get too far" because Moyers "kicked the door in." Luhrsen then "stopped" and decided he was "not going to run" because Moyers had a gun.

This evidence provides no basis to infer that Luhrsen ever was free or felt free until after he fled from the house. Like the victim, Michael, in *Bartlett*, Luhrsen was continuously "either tied up, under the control of the gun, or acting under the threat or fear of force." *Id.* And so, because

Moyers committed just one offense of criminal confinement, both of his convictions cannot stand. When, as here, a defendant is twice convicted of the same offense, "the proper remedy is to vacate the conviction with the lesser penalty." *Eversole v. State*, 251 N.E.3d 604, 609 (Ind. Ct. App. 2025), *trans. denied*. Moyers's lesser felony conviction must therefore be vacated.

In closing, we briefly address a few material misunderstandings and mischaracterizations in our colleague Justice Slaughter's dissent. It critiques the tests we unanimously adopted in *Wadle* and *Powell*, our decision to apply *Powell* here, and our application of *Powell*. And throughout, it contends that we have substituted "our own sense of what is legally permissible and impermissible in criminal cases for that of the legislature." *Post*, at 2. But we have faithfully done just the opposite.

Both substantive-double-jeopardy tests carry out legislative intent as expressed in statute: *Wadle* explains how to apply the included-offense statutes, 151 N.E.3d at 253, and *Powell* explains how to determine whether a "statute permits punishment for a single course of criminal conduct or for certain discrete acts," 151 N.E.3d at 264. Here, we applied *Powell* to give effect to the statutory text that has placed Level 3 and Level 4 felony criminal confinement within a single statutory offense. Then, in identifying criminal confinement as a conduct-based offense, we referred to its unit of prosecution as defined by statute—"confin[ing] another person without the other person's consent." I.C. § 35-42-3-3(a). And in finding one confinement, we simply applied that definition to these facts. The dissent's call to discard our caselaw interpreting and applying criminal statutes and instead "return to [the] text," *post*, at 14, would mean discarding the very precedents that guide us in making sense of ambiguous statutes, *see Powell*, 151 N.E.3d at 266–68 (explaining why the unit of prosecution for attempted murder is ambiguous).

What's more, the dissent advocates positions that conflict with the Legislature's design. It states that "a multiplicity problem arises only when the included-offense statute does not apply," *post*, at 8, even though the definition of a statutory offense will **always** limit how many offenses may be punished, *Powell*, 151 N.E.3d at 263–64. And it would limit *Powell* to scenarios where a single criminal act "results in a recurrence of the

**same** consequence or injury," *post*, at 8, contrary to the plain language of statutes—like the one defining criminal confinement—that elevate a single offense for reasons other than consequences or injury. *See, e.g.*, I.C. § 35-42-3-3(b)(1)(B), (3)(A).[4]

In short, we read the criminal confinement statute as the Legislature wrote it, applied our precedents as we have articulated them, and concluded that the statute on these facts "forbids the State from . . . obtaining convictions on [both] charges." *Post*, at 2. We have thus decided the exact "question" the dissent criticizes us for failing to "consider." *Id.*

# Conclusion

For the reasons provided above, we reverse and remand with instructions for the trial court to vacate Moyers's Level 4 criminal confinement conviction. And we instruct the court to enter an amended sentencing order, which will in effect reduce Moyers's 100-year sentence by four years to an aggregate sentence of ninety-six years. In its amended order, the trial court should also ensure it attaches the habitual offender and firearm enhancements to specific convictions.

Goff, J., concurs.
Molter, J., concurs with separate opinion.
Slaughter, J., dissents with separate opinion in which Massa, J., joins.

---

[4] The dissent reads our opinion as taking *Powell*-type cases out of the scope of the included-offense statutes examined in *Wadle*. *Post*, at 9–11. But when *Powell* applies, its test is at least as protective as the included-offense statutes, so there is no need to also apply *Wadle*.

ATTORNEY FOR APPELLANT

Victoria Bailey Casanova

Casanova Legal Services, LLC

Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita

Attorney General of Indiana

Steven J. Hosler

Deputy Attorney General

Indianapolis, Indiana

## Molter, J., concurring.

In *Richardson v. State*, our Court announced a new framework for analyzing substantive double jeopardy challenges. 717 N.E.2d 32 (Ind. 1999). Reflecting the complexity of the questions, our five-member court issued four opinions. And the opinion of the Court acknowledged that "[t]he analysis and application of double jeopardy provisions have proven to be a significant judicial challenge," as even provisions "which appear straightforward and simple[ ] are often extremely difficult to apply and the underlying jurisprudence enormously challenging and complex." *Id.* at 37.

About six years ago, my friends Justices Slaughter and Massa joined unanimous opinions overruling *Richardson* sua sponte. *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020); *Powell v. State*, 151 N.E.3d 261 (Ind. 2020). They concluded our predecessors' work in *Richardson* was well-meaning but perpetuated the problem the Court had set out to solve, producing "a patchwork of conflicting precedent and inconsistent standards, ultimately depriving the Indiana bench and bar of proper guidance in this area of the law." *Wadle*, 151 N.E.2d at 235. So they crafted new frameworks through *Wadle* and *Powell* and then elaborated on *Wadle* in *A.W. v. State*, 229 N.E.3d 1060 (Ind. 2024).

Just a short while later, their dissenting opinion today offers the same critique of their own work. As they said of *Richardson*, they now say "the *Wadle/Powell* tests are not merely unhelpful but unworkable," and those tests should be discarded as "worthy (though ultimately failed) experiments to bring greater clarity and principle to this important area of law." *Post*, at 16. Having spotted the same problems they saw before, they again propose the same approach: overrule the Court's seminal double jeopardy precedents and replace them with another new framework they've crafted, once again sua sponte.

To be sure, courts can overrule their precedents sua sponte, as even some seminal United States Supreme Court decisions do. *See, e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 69 (1938). But we should do so with reluctance because "the adversary system is a cornerstone of our jurisprudence." Bryan A. Garner et al., *The Law of Judicial Precedent* 226 (2016). And we

should be especially reluctant in areas where our Court has concluded that our prior attempts to clarify the law have been flawed.

As my dissenting colleagues acknowledge, substantive double jeopardy issues have long vexed our Court, *post*, at 15, just as they have other courts, *see, e.g.*, *Albernaz v. United States*, 450 U.S. 333, 343 (1981) (observing that "the decisional law in the area [of double jeopardy] is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator"). And my colleagues' conclusion that we should again jettison our precedent rests on their belief that they were clearly mistaken in joining *Wadle* and *Powell. See Marsillett v. State*, 495 N.E.2d 699, 704–05 (Ind. 1986) ("[A] rule which has been deliberately declared should not be disturbed by the same court absent urgent reasons and a clear manifestation of error."). That experience should caution some restraint. If they're right that their prior trailblazing, unguided by the parties, took us so far afield, then we should learn from that mistake rather than repeat it. *Post*, at 16 (explaining their view that *Wadle* and *Powell* cannot be saved with "a modest revision here or an occasional tweak there").

That is, if another course correction is due, we should wait for a party to propose it, and then we should test any new framework through our standard adversarial briefing and oral argument process. But here, no party asked us to revisit *Wadle* or *Powell*, and neither the parties nor the Court of Appeals have advocated that we adopt the framework my dissenting colleagues propose. So rather than getting over my skis, I join the Court's opinion, which faithfully applies our precedents.

**Slaughter, J., dissenting.**

Six years ago, we "overhauled" our substantive-double-jeopardy framework in *Wadle* and *Powell* to provide state-law protections for criminal defendants who face what the Court describes as "multiple convictions for the same offense in a single trial." *Ante*, at 2 (Rush, C.J.); see *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020); *Powell v. State*, 151 N.E.3d 256 (Ind. 2020). Today, the Court holds that Marvin Moyers's dual convictions for Level 3 and Level 4 felony criminal confinement must be analyzed under *Powell*, which the Court says applies "when a defendant is convicted of a single statutory offense multiple times." *Ante*, at 2. Then, applying *Powell*, the Court concludes that Moyers's Level 4 conviction must be vacated and his aggregate sentence reduced from 100 years to ninety-six years.

I respectfully dissent because I disagree with the Court's methodology and with its decision on this record to vacate Moyers's Level 4 conviction for felony criminal confinement. For purposes of my separate opinion, I accept for argument's sake the Court's assumption that this case presents a substantive-double-jeopardy issue—that Moyers committed only one criminal act, *id.* at 15–18 (Section II.B), and not two. I am not sure that is right. It seems to me just as likely that Moyers committed two separate acts of criminal confinement for which he could be lawfully charged, tried, convicted, and sentenced. But that issue is beyond the scope of my separate opinion. For these purposes, I assume we face a substantive-double-jeopardy issue here and discuss how I believe we should resolve such claims.

First, I discuss the flaw in our developed substantive-double-jeopardy framework, especially our focus on which judicially devised test to apply in each case. Next, I describe what I believe to be the applicable statutory framework, divorced from the *Wadle/Powell* dichotomy. Last, I apply my proposed substantive-double-jeopardy framework here, concluding that this case would be properly decided under the included-offense statute, but for Moyers's waiver.

# I

The label "substantive double jeopardy" is both misleading and misguided. Such cases are not at all about double jeopardy, which is a **procedural** right under the constitution not to be charged with the "same offense" in separate criminal prosecutions. *Schoeff v. State*, 268 N.E.3d 273, 275–76 (Ind. 2025) (Slaughter, J., dissenting from the denial of transfer). Substantive-double-jeopardy cases are only about interpreting and applying statutes. Too often we get the wrong answer in these cases because we ask the wrong question. The right question is not "*Wadle* or *Powell*?" It is whether anything in the applicable criminal statutes (or in the Indiana Code writ large) forbids the State from bringing multiple criminal charges, obtaining convictions on the charges, and securing an aggregate sentence on the charges.

Yet rather than consider this question, the Court devotes its opinion to counting statutory offenses and (mostly) picking which judicially created test—*Wadle* or *Powell*—to apply here. Although I joined both *Wadle* and *Powell* in 2020, I can no longer subscribe to what I have concluded is merely the latest iteration of our Court's now decades-long practice (dating at least to *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999)) of substituting our own sense of what is legally permissible and impermissible in criminal cases for that of the legislature. It would be one thing if we were interpreting and applying the state or federal constitution. The legislature, it goes without saying, cannot exceed or violate constitutional limits on governmental power. And it is the role of courts to enforce such limits. But our substantive-double-jeopardy cases have nothing to do with the constitution—what it permits, requires, or forbids. These cases, instead, have everything to do with legislative enactments—specifically, what the applicable statutes permit, require, or forbid of prosecutors and courts.

Though we should be focusing on statutes alone, we created two tests (*Wadle* and *Powell*) to analyze substantive-double-jeopardy claims. And we needed a way to tell what test applies to what circumstances. Our simple, but imperfect solution: count the number of statutes. As *Wadle* put it, "Substantive double jeopardy claims come in two principal varieties: (1) when a single criminal act or transaction violates **a single statute** but

harms multiple victims, and (2) when a single criminal act or transaction violates **multiple statutes** with common elements and harms one or more victims." *Wadle*, 151 N.E.3d at 247 (emphasis added). *Powell*, we said, describes the former scenario; *Wadle*, the latter. *Ibid.* In the abstract, I agree that *Wadle* and *Powell* correctly identify the two aspects of substantive-double-jeopardy claims. But our choice to exalt case law over statutes has led to countless problems, evidenced by our own efforts at clarifying these twin tests and the ongoing struggle in lower courts to apply these standards consistently.

Our repeated revisions to *Wadle* and *Powell* reveal their infirmity. In *A.W. v. State*, 229 N.E.3d 1060 (Ind. 2024), we "adjust[ed]" *Wadle*'s second step to create a "rebuttable presumption", designed to let the defendant obtain the benefit of ambiguity in the charging information. *Id.* at 1069 n.10, 1070. Now, two years after *A.W.*, we must revise our precedent yet again to clarify the meaning of a "statutory offense". This latest revision is necessary, the Court says, to determine "whether *Powell* or *Wadle* applies when a defendant's convictions stem from multiple violations of the same statute with differing enhancing circumstances or penalty levels." *Ante*, at 6. That we must clarify, yet again, how to pick between the two tests is a telling sign. After all, we were clear at the start that *Wadle* applies when "multiple statutes" are violated; *Powell* applies to the violation of a "single statute". *Wadle*, 151 N.E.3d at 247. Yet the Court now disavows such an approach, opting instead for a categorical definition of "statutory offense" for choosing which test applies. *Ante*, at 7–13 (Section I). Given the ongoing flux in our post-*Wadle* and post-*Powell* case law, I suspect today's latest clarification will not be our last.

The *Wadle* and *Powell* frameworks have bred confusion and inconsistency. Our lower courts often lament the difficulty in applying these precedents and, relevant here, how to choose between them. Judge Bailey, dissenting from the panel's decision below to apply *Wadle*, noted that same difficulty. Though he applied *Powell*, Judge Bailey admitted it was "not a perfect fit, because we are concerned not with multiple injuries to a single victim but with one moderate bodily injury" to one victim by "one means of commission, use of a gun." *Moyers v. State*, 249 N.E.3d 667, 675 (Ind. Ct. App. 2024) (Bailey, J., concurring in part and dissenting in part).

And as Judge Vaidik noted in an early *Wadle/Powell* case, it is unrealistic to think these two tests:

> can be superimposed on any future contingencies and provide the answer to all our double-jeopardy queries. Neither test may provide the perfect fit. Instead of trying to cram each possibility into the *Wadle* bucket or the *Powell* bucket, we should be guided by the principles expounded in the two cases.

*Jones v. State*, 159 N.E.3d 55, 67 (Ind. Ct. App. 2020) (Vaidik, J., concurring). Judge Vaidik deserves credit for her prescient fear that our substantive-double-jeopardy doctrine would soon be dominated by unwavering fidelity to case law rather than to the underlying statutory "principles expounded" in *Wadle* and *Powell*. *Ibid.* Recognizing the prevailing difficulty of choosing one test over the other, another appellate panel recently threaded this needle by applying both tests. *White v. State*, 264 N.E.3d 99, 102–03 (Ind. Ct. App. 2025).

I would take a different path. I would refocus our substantive-double-jeopardy law on the only considerations that should matter—which is what the key statutes say. We should focus, in other words, on the statutes (a) defining the crimes prosecutors can charge and (b) specifying the offenses for which (i) juries can convict and (ii) courts can impose sentence and enter judgment.

I turn next to describing what I believe to be the applicable statutory framework, divorced from the *Wadle/Powell* dichotomy.

## II

All substantive-double-jeopardy claims start the same: The defendant argues he received "multiple convictions or punishments for the 'same offense' in a single trial." *Wadle*, 151 N.E.3d at 239 (citation omitted). The argument comes in two varieties: (a) The defendant was convicted of an offense and a lesser-included offense in a single trial; (b) the defendant was convicted multiple times because multiple injuries or consequences resulted from a single criminal act. Below I describe the two varieties of

substantive double jeopardy and the proper statutory framework for resolving them.

A

Under our included-offense statute, "judgment and sentence may not be entered against the defendant" for "an offense and an included offense in separate counts". Ind. Code § 35-38-1-6. An offense is included within another offense if it:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

*Id.* § 35-31.5-2-168. If a single criminal act or transaction amounts to both "an offense and an included offense", then we must vacate the conviction for the included offense. *Id.* § 35-38-1-6.

At its core, *Wadle* was supposed to be about guiding our courts to apply the included-offense statute. Indeed, our opinion's express purpose was to herald a renewed "focus on statutory interpretation" and "appl[y] the statutory rules of double jeopardy." *Wadle*, 151 N.E.3d at 235. But how to apply the included-offense statute differs markedly between my approach today and that first taken in *Wadle* and then later in *A.W.* Chief among these differences is *Wadle*'s reliance on "steps", "presumptions", and "rebutta[ls]". *A.W.*, 229 N.E.3d at 1069 n.10, 1069–71. I would cast aside these rules altogether and empower our courts simply to interpret and apply the statutes before them.

In contrast to my straightforward, text-based approach, *Wadle*'s framework puts the cart before the horse and leads to several inefficiencies. For example, its analysis begins by considering whether the text of the

relevant statutes "clearly permits multiple punishment" (which they almost never do), then looks to the included-offense statute to determine whether the offense is included in another offense. *Wadle*, 151 N.E.3d at 248. Only after finding that one offense is included in the other does the court then examine, at the "final step", *A.W.*, 229 N.E.3d at 1071, those facts to determine whether only one criminal act occurred. *Wadle*, 151 N.E.3d at 248. *Wadle*'s initial presumption that a single criminal act occurred is both circular and consumes judicial resources needlessly. Everyone agrees that a defendant who commits separate offenses can be convicted and punished for each offense. Whether a single criminal act occurred, then, should be the threshold question for any substantive-double-jeopardy claim. By deferring a dispositive, fact-based question until the end, *Wadle* requires courts to perform work that could otherwise be avoided. See *White*, 264 N.E.3d at 108 (Felix, J., concurring in the judgment) (noting the inefficiency in conducting the substantive-double-jeopardy analysis by "presum[ing] that a single criminal act or transaction has occurred").

In short, we should begin with the included-offense statute if the defendant committed just one criminal act but was charged and convicted of multiple offenses. We could resolve most substantive-double-jeopardy claims just by applying this statute.

B

The included-offense statute, though, does not cover every substantive double-jeopardy violation. Specifically, it does not apply when the defendant has been convicted of an identical offense multiple times. Such cases are not about included offenses but the distinct concept of multiplicity. In describing multiplicity, I first lay out how I believe this statutory analysis should proceed. Then, I assess the Court's distinct analysis and highlight its shortcomings.

1

Multiplicity, which is distinct from the included-offense statute, does not ask "whether one offense is included in the other", but whether a single act can be punished twice when that act resulted in multiple injuries to

(or other consequences for) the victim. *Powell*, 151 N.E.3d at 263. Though a multiplicity problem may arise in many forms, see *id.* at 261 (listing examples), all multiplicity problems share certain characteristics—a single criminal act resulting in several of the **same** consequences.

Consider two examples from the United States Supreme Court. In *Bell v. United States*, the defendant had two trafficking convictions for "transport[ing] . . . two women on the same trip and in the same vehicle." 349 U.S. 81, 82 (1955). The federal Mann Act made it a crime to "knowingly transport[] in interstate or foreign commerce . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose." *Ibid.* (quoting 18 U.S.C. 2421 (1949) (ellipsis in original)). As the Court framed the issue, "Congress could no doubt make the simultaneous transportation of more than one woman in violation of the Mann Act liable to cumulative punishment for each woman so transported." *Id.* at 82–83. The relevant question, though, was simply "did [Congress] do so?" *Id.* at 83. Another multiplicity example concerns a defendant who opened multiple "mail bags" in a single robbery, *Ebeling v. Morgan*, 237 U.S. 625, 628 (1915), thus raising the question "whether one who, in the same transaction, tears or cuts successively mail bags of the United States . . . is guilty of a single offense, or of additional offenses because of each successive cutting with the criminal intent charged." *Ibid.*

Like these cases, *Powell* presented a multiplicity problem. There, we considered whether the attempted-murder statute contemplated multiple convictions for the "**same** offense". 151 N.E.3d at 263 (emphasis in original). This inquiry was necessary, we said, because the legislature could have written the attempted-murder statute to criminalize various acts—making it a separate crime, for example, each time a defendant pointed his weapon at a potential victim; or each time the defendant pulled the trigger. *Ibid.* Our task was to read the statute and divine what specific conduct the legislature had criminalized. We needed to determine, in other words, the prohibited "unit of prosecution". *Id.* at 264. *Powell* never decided the attempted-murder statute's "unit of prosecution", though. Instead, it applied the rule of lenity to hold that "the statute permits the prosecution for only a single criminal offense." *Id.* at 268. This result tracked what the Supreme Court did in *Bell*: "if Congress does not fix the punishment for a

federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses". 349 U.S. at 84.

Under *Powell*'s correct logic, a multiplicity problem arises only when the included-offense statute does not apply. *Powell* reasoned that "[t]he question here is not whether one offense is included in the other (attempted murder is clearly the same as attempted murder)." 151 N.E.3d at 263. The question, rather, is "whether 'the same act may be twice punished' as 'two counts of the **same** offense.'" *Ibid.* (emphasis in original). Thus, the multiplicity framework is used only in limited circumstances—when a single criminal act or transaction results in a recurrence of the **same** consequence or injury, rendering the included-offense statute inapplicable.

The included-offense statute thus creates a simple hierarchy for substantive-double-jeopardy claims. Courts should start with the included-offense statute. If the statute applies, then courts must apply it and vacate convictions for any included offenses. If the statute does not apply because the offenses are "clearly the same" (e.g., repeated convictions for attempted murder), *ibid.*, then (and only then) does a court analyze a potential multiplicity problem.

2

Today's opinion deviates from this simple path for deciding substantive-double-jeopardy claims and labors to make multiplicity fit here. To do so, the Court creates three new "categories" of criminal statutes to aid courts in choosing between *Wadle* or *Powell*: (1) elevated offenses that share a common base offense; (2) statutes with separate base offenses; and (3) statutes with base offenses with alternative elements. *Ante*, at 7–13 (Section I) (discussing three categories of criminal statutes). It would be one thing if these categories were defined by the legislature or easy to apply in practice. But they are neither. Indeed, the Court admits that its categorical approach "may pose interpretive challenges". *Id.* at 12. Respectfully, the last thing our substantive-double-jeopardy case law needs are further "interpretative challenges".

But worse than the added complexity, the categories yield outcomes irreconcilable with applicable statutes. Take category one, which is the focus of today's opinion. The Court's label for this category—"elevated offenses that share a common base offense", *id.* at 8—is just an embellished way of describing an "included offense". See I.C. § 35-31.5-2-168. Yet the Court does not apply the included-offense statute to category-one statutes. The Court, instead, adopts a per se rule for category one that "multiple convictions under these statutes are reviewable under *Powell*." *Ante*, at 11. This decision resolves, I suppose, the *Wadle/Powell* issue in cases arising under the criminal-confinement statute. But it leaves unresolved umpteen more statutes—including the thorny, "category three" statutes with all their "complexity and nuance". *Id.* at 13. We can and should do better.

What is more, the Court's categories are squarely at odds with the included-offense statute. By its terms, the statute applies "[w]henever" a defendant is convicted of both an offense and an included offense. I.C. § 35-38-1-6. Yet the Court holds that convictions under the criminal-confinement statute, including included offenses, are never subject to the included-offense statute. *Ante*, at 11. Never mind that the Court reaches this result only by elevating its own definition of "statutory offense" over the express terms of the included-offense statute. The legislature's express command that the statute applies "whenever" a base conviction accompanies an included-offense conviction, leaves no room for the Court's implied categorical exceptions "discerned from" statutory "structure" and "design", *id.* at 7, 17.

On its face, the criminal-confinement statute is subject to the included-offense statute. The criminal-confinement statute has many subparts. It punishes, among other things, confinement resulting in "serious bodily injury" as a Level 3 felony, I.C. § 35-42-3-3(b)(3)(B), and confinement resulting in "moderate bodily injury" as a Level 4 felony, *id.* § 35-42-3-3(b)(2). Until today, convictions for these two offenses triggered the included-offense statute, *id.* § 35-31.5-2-168(3), and resulted in vacatur of the lesser-included Level 4 conviction. As the appellate panel below noted correctly, if a defendant is convicted of criminal confinement for inflicting both "serious" and "moderate" bodily injury in the same transaction, "the latter offense is **unquestionably** inherently included in the former" under the

included-offense statute. *Moyers*, 249 N.E.3d at 672 n.3 (emphasis added). Unquestioned by all, that is, but our Court, which now holds that the included-offense statute does not mean what it says and does not apply to convictions under the criminal-confinement statute.

The Court's insistence that its devised "category one" definition of "statutory offense" supplants the legislature's actual definition—reflected in the included-offense statute—does not pass muster. The included-offense statute is the legislature's clearest expression of its substantive-double-jeopardy policy. We should not alter fundamental details of the legislature's substantive-double-jeopardy scheme based on implied, judicially created definitions of statutory "structure" and "design", *ante*, at 7, 17. "[W]e give dispositive weight to the plain language" of a statute, not to "the asserted intent behind" it. *K.C.G. v. State*, 156 N.E.3d 1281, 1283 (Ind. 2020).

The Court dismisses the concern that its categorical framework subverts the included-offense statutes, pronouncing that the decision to apply *Powell* means "there is **no need** to also apply *Wadle*." *Ante*, at 18 n.4 (emphasis added). No need to apply *Wadle*? *Wadle*, after all, is about "how to apply the included-offense statutes". *Id.* at 17. Courts have no say about whether to apply an applicable statute. "If a statute's text compels a particular result, judges must not second-guess the outcome, even if it offends our own sensibilities." *State v. Neukam*, 189 N.E.3d 152, 155 (Ind. 2022). Yet the Court ignores these statutes and thus elevates a court-created rule over authoritative legislative enactments. Though the Court charges me with advocating "positions that conflict with the Legislature's design", *ante*, at 17, I thought it was central to that "design" that courts—no less than the public—must respect and follow such enactments.

Nor does it matter that the Court thinks *Powell* is "at least as protective as the included-offense statutes". *Id.* at 18 n.4. There is no basis for believing that *Wadle* and *Powell* are each overlapping frameworks that give defendants "at least as" much protection under one as the other. *Wadle* and *Powell*, as I have discussed, are distinct frameworks for addressing distinct problems. The Court initially thought so, too. Recall how it framed this case from the outset—as an issue of which is "the proper test" (*Wadle* or

*Powell*) for resolving Moyers's substantive-double-jeopardy claim. *Ante*, at 2. Yet sixteen pages later, the Court says it does not matter, that either test will do, thus blurring the stated reason for undertaking this project at all.

In the end, the Court exalts our own decreed set of protections for criminal defendants, reflected in *Wadle* and *Powell*, that are nowhere found in statutes or our constitution and that date at least to *Richardson*. These substantive-double-jeopardy cases are supposed to be about interpreting and applying criminal statutes. To the extent these statutes do not go far enough (in the Court's view) to protect individual liberties, the proper fix is not for courts to supply the missing pieces. It is for the People to persuade their fellow citizens that further protections are warranted and to codify these protections in statutes or the constitution.

III

In lieu of the Court's approach, I would resolve this case by applying the included-offense statute and reserving the multiplicity doctrine to the cases that remain—to those cases, in other words, where the defendant commits a single criminal act resulting in several of the same consequences. I turn next to applying these two frameworks—the included-offense statute and our multiplicity doctrine—to this case.

I begin with the included-offense statute. Assuming for argument's sake that Moyers committed criminal confinement here only once, see *id.* at 15–18 (Section II.B), then he would be entitled to relief under the included-offense statute. His two criminal-confinement convictions differ only in respect of the risk of harm to his victim. Yet he did not develop this argument on appeal, so it is waived. And though the Court resolves this case under the *Powell* framework, its analysis is unworkable.

A

The included-offense statute defines three types of offenses of which a defendant can be convicted. Relevant here, an offense is included within another if it either "differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission." I.C. § 35-31.5-2-168(3).

Again, assuming the Court is correct that "Moyers imposed only one period of confinement", *ante*, at 15, then he would be entitled to relief under the statute's third prong: His two criminal-confinement convictions differ "only in the respect that a less serious harm or risk of harm" is required to establish their commission. I.C. § 35-31.5-2-168. The appellate panel below thought differently, though. It believed that "getting moderately injured is not quite the same harm or risk of harm as the harm caused or the risk of harm that existed by virtue of the confiner being armed with a deadly weapon." *Moyers*, 249 N.E.3d at 672.

I am not so sure. The third prong of the included-offense statute does not say that two offenses, to be included offenses, must **match** the type or degree of harm the legislature seeks to punish. The statute simply recounts the ways two statutes can have differing degrees of punishment. If the convictions differ only in that one imposes a "less serious harm or risk of harm to the same person", I.C. § 35-31.5-2-168, then courts cannot enter convictions on both counts because one of the offenses is a lesser-included offense of the other. *Id.* § 35-38-1-6. Relevant here, the legislature treats a crime resulting in moderate bodily injury as "less serious" than one committed with a deadly weapon—as shown by the legislature's decision to classify criminal confinement with a deadly weapon as a Level 3 felony, *id.* § 35-42-3-3(b)(3)(A), and criminal confinement resulting in moderate bodily injury as a Level 4 felony, *id.* § 35-42-3-3(b)(2).

That said, Moyers conceded at oral argument that he loses under *Wadle*, which is shorthand for saying that he loses under the included-offense statute, so he has waived any argument for relief under this statute. I mention this approach only to show how I would resolve the presented substantive-double-jeopardy claim, as an alternative to the *Wadle* framework, and to show that the *Powell* multiplicity framework is not the only way—much less the best way—to understand Moyers's substantive-double-jeopardy claim.

B

Because Moyers's claim falls under the included-offense statute, the analysis should stop there. But even were the Court right to treat this as a multiplicity problem, its opinion still underscores why our substantive-double-jeopardy precedent is unworkable.

The first step in solving a multiplicity problem is identifying the statute's unit of prosecution. "A 'unit of prosecution,' in simple terms, is the specific act or conduct our Legislature intended to treat as one punishable offense under a criminal statute." *Ante*, at 13–14 (citing *United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015) (en banc) (Gorsuch, J.)). The unit of prosecution, in other words, is "the minimum amount of activity for which criminal liability attaches". *Rentz*, 777 F.3d at 1108 (quoting *United States v. Cureton*, 739 F.3d 1032, 1041 (7th Cir. 2014)). A statute's unit of prosecution stems from its text. When interpreting a statute, we start with the text. We interpret statutes by giving the words their plain meaning, considering the statutory structure as a whole and avoiding interpretations that render any part of the statute meaningless or superfluous. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195, 1199 (Ind. 2016).

The Court's opinion pays lip service to this textual framework. It recites that we ask "[i]f the statute, whether expressly or by judicial construction, indicates a unit of prosecution." *Ante*, at 13 (quoting *Powell*, 151 N.E.3d at 264). But the Court then casts aside text in favor of the statute's "gravamen". *Id.* at 15. Indeed, the Court does not engage in textual analysis at all. It simply states that "[t]he parties appropriately agreed in their briefing that the criminal confinement statute contains no express unit of prosecution". *Ibid*. The parties also agreed on the statute's "gravamen"—that it "sets forth a conduct-based crime." *Ibid.* The Court adopts this same understanding. Consider that. The Court aligns its analysis on the agreement of two parties that admit they cannot discern "the specific act or conduct" the statute punishes, yet the parties "nevertheless" claim to know the statute's "gravamen". *Id.* at 13, 15. It is unclear why it is easier to determine a statute's "gravamen" than the actual conduct the statute prohibits. Discerning the unit of prosecution here is straightforward.

As then-Judge Gorsuch explained, "When seeking a statute's unit of prosecution—when asking what the minimum amount of activity a defendant must undertake, what he must do, to commit each new and independent violation of a criminal statute—the feature that naturally draws our immediate attention is the statute's verb." *Rentz*, 777 F.3d at 1109. In Indiana, criminal confinement occurs whenever a person "knowingly or intentionally confines another person without the other person's consent". I.C. § 35-42-3-3(a). This statute contains just one verb: "confines". Thus, our criminal-confinement statute makes it easy to determine the "minimum amount of activity for which criminal liability attaches": Each confinement amounts to one crime. See *Rentz*, 777 F.3d at 1108–09 ("[I]f a law's verb says it's a crime to **kill** someone, we usually think a defendant must **kill** more than one person to be found guilty of more than one offense.") (emphasis in original).

Compare this text-based analysis with the Court's focus on the statute's "gravamen". A statute's gravamen, the Court says, is determined by asking whether a statute is "conduct-based" or "result-based". *Ante*, at 14. As their names imply, a conduct-based statute focuses on the defendant's actions, while a result-based statute looks to the consequences of those actions to the victim. *Powell*, 151 N.E.3d at 265–66. The problem with this "gravamen" analysis, as *Powell* showed, is that criminal statutes often contain aspects of both. *Id.* at 266–68.

Here, the parties agree that criminal confinement is a "conduct-based crime." *Ante*, at 15. But consider the difficulty of this question had the parties not agreed. Either party could have pointed out that, under *Powell*, the statute's contemplation of a victim implies that the statute is result-based. 151 N.E.3d at 267. Yet *Powell* offered no mechanism for comparing a statute's dual purposes. It simply side-stepped the problem and applied the rule of lenity. *Id.* at 268. Unless we intend to rely on the rule of lenity each time the parties disagree, the only solution is to discard our focus on a statute's "gravamen" and return to its text.

Finally, the Court's remedy cannot be squared with its holding that *Powell* applies here. According to the Court, the proper remedy here—where the defendant was "twice convicted of the same offense"—is "'to

vacate the conviction with the lesser penalty.'" *Ante*, at 17 (quoting *Eversole v. State*, 251 N.E.3d 604, 609 (Ind. Ct. App. 2025), trans. denied). The Court's reliance on *Eversole* is noteworthy. *Eversole* is, after all, a *Wadle* case. *Eversole*, 251 N.E.3d at 609 (citing *Wadle*, 151 N.E.3d at 256). *Wadle*, in turn, derived this remedy from the included-offense statute, which instructs courts to vacate the conviction for the "included offense". 151 N.E.3d at 256 n.36 (citing I.C. § 35-38-1-6). Vacating "the conviction with the lesser penalty" is the proper remedy under the included-offense statute. I.C. § 35-38-1-6. But the Court does not apply the included-offense statute. It says *Powell* is "the proper test" here. A*nte*, at 8. Yet, inexplicably, the Court adopts the remedy from *Wadle* and the included-offense statute—the very remedy decreed by a statute the Court expressly disavows.

By adopting a far-reaching view of *Powell*, the Court stretches our precedent beyond recognition to vacate Moyers's lesser conviction. The Court's application of *Powell* is confusing; its analysis, unworkable; its remedy, atextual.

\* \* \*

My main problem with today's decision, and with our substantive-double-jeopardy jurisprudence generally, is that we impose court-made rules on what are supposed to be purely statutory questions. Our rules are not limits the People imposed through their elected representatives in the legislature or through our state's fundamental charter, but limits we impose through the coercive power of the courts. What is worse, we do not own up to what we do. We pronounce these rules and apply them as if they had some distinguished pedigree. They do not.

We have gone down this path before. Our stated reason for creating the *Wadle* and *Powell* frameworks, after all, was to remove—root and branch—the prevailing "patchwork of conflicting precedent, a jurisprudence of 'double jeopardy double talk'". *Wadle*, 151 N.E.3d at 244 (quoting Akhil Reed Amar, *Double Jeopardy Law Made Simple*, 106 Yale L.J. 1807, 1807 (1997)). Unfortunately, the Court's opinion perpetuates the same problems we undertook to fix (or so I thought) in those two cases.

My friend Justice Molter, responding to my separate opinion, counsels "caution" and "restraint" before adopting my proposed "new framework" for resolving substantive-double-jeopardy claims, lest we "repeat" our prior mistakes in this area. *Ante*, at 1, 2 (Molter, J.). It is noteworthy that he views my text-based proposal to rely on the included-offense statute when it applies as "getting over my skis". *Id*. at 2. I would have thought that following applicable statutes **is** the cautious, restrained approach for deciding the matters that come before us. Despite our rival views of judicial restraint here, I too would be reluctant to change course if I believed *Wadle* and *Powell* had set us on the right path. If the only fix these precedents needed were a modest revision here or an occasional tweak there, then I agree no course correction would be warranted.

But the growing chorus of appellate case law persuades me that the *Wadle/Powell* tests are not merely unhelpful but unworkable. Though I signed on six years ago, I now see these precedents as worthy (though ultimately failed) experiments to bring greater clarity and principle to this important area of law. I do not reach these conclusions lightly. My view has evolved over several years as panel after panel from our court of appeals has invited—no, implored—us to clarify our rulings, hoping we will explain what these precedents mean, when they apply, how they apply. Our appellate court hears hundreds of these cases every year; our trial courts, even more. There is no reason to expect the volume of these cases or the importance of these issues to recede. I have come to share the frustration espoused by recurring appellate panels that view this area of law as needlessly complex. As I see it, we do no one (ourselves included) any good by prolonging the confusion and deferring the needed clarity. It is time to ground our substantive-double-jeopardy jurisprudence in statutes and not our Court-conceived rules.

For these reasons, I respectfully dissent.

Massa, J., joins.